United States District Court
Southern District of Texas
**ENTERED**
September 28, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CALVIN DEWAYNE BREWER, (TDCJ #2069355) | § § § | |
| Plaintiff, | § § | CIVIL ACTION NO. H-19-1219 |
| VS. | § § | |
| TAYLOR J. GEERDES, *et al.*, | § § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Calvin Dewayne Brewer, a Texas Department of Criminal Justice inmate, (TDCJ #2069355), filed a civil action under 42 U.S.C. § 1983, alleging excessive force in the prison where he was incarcerated. The defendants moved for summary judgment on the basis of qualified immunity, and Brewer responded. (Docket Entries Nos. 23, 24, 25, 26). Based on a careful review of the pleadings, the motion and response, the record, and the applicable law, the court grants the motion and enters a separate order dismissing this action with prejudice. The reasons are explained below.

**I.   Background and Procedural History**

Brewer filed this action in February 2019. He alleges that on September 18, 2018, the defendants, correctional guards at the Estelle Unit, punched him several times, fracturing multiple bones in his body. Docket Entry No. 1 at 4. In the grievances Brewer attached to his complaint, he alleges that the incident started when he asked Officer Gregory whether and when his commissary restriction would be lifted and, if not, if he could get an I-60 form to file a grievance. Docket Entry No. 1-1 at 1. Brewer alleges that Gregory told him to move out of the

hallway or he would receive a disciplinary case. *Id.* Gregory then asked Brewer for his identification card, but Brewer refused because an inmate count was in process. *Id.*

Brewer alleges that at this point, another guard, Officer Geerdes, came up and told Brewer that he was lucky he would not be going to the A-wing, a more restrictive housing unit. *Id.* When Brewer said that he did not care about that, Geerdes told him that he would be taken to A-wing and ordered him to "cuff up." *Id.* A third guard, Officer Goodall, joined and also ordered Brewer to "cuff up." *Id.* Brewer told Goodall that he thought the others would hurt him and asked Goodall to get a video camera to film any force that might be used. *Id.* Goodall agreed and asked for a video camera. *Id.*

Brewer alleges that while they waited, Geerdes put his hands around his handcuffs as if they were brass knuckles and told Brewer that he intended to use the makeshift weapon against him. *Id.* Brewer began trying to explain to Goodall what had happened before Goodall walked up. At that point, Brewer alleges, Gregory punched him repeatedly — between two to six times — in the face. *Id.*; Docket Entry No. 1 at 3-4. Brewer alleges that Geerdes then hit him with the makeshift brass knuckles. Docket Entry No. 1 at 4.

In his grievances, Brewer alleges that a "gang of other C.O.s with [Geerdes] just punched me down and after putting me in cuffs they slammed me to the ground." Docket Entry No. 1-1 at 1. In his complaint, however, Brewer alleges that another guard, Officer Valdez, was the second person to hit him after Gregory. Docket Entry No. 1 at 4. Brewer alleges in his complaint that when he was on the ground, another guard, Officer Lopez, sat on his back, making it hard for him to breathe. *Id.* Brewer alleges that after he was handcuffed and shackled and being escorted towards the A-wing pass through the hallways by North Gate 1, another guard, Officer Villegas,

2

slammed him into the ground. *Id.* Brewer's complaint does allege that Goodall participated in the use of force against him, but it does not describe what Goodall did. *Id.*

Brewer alleges that he suffered three rib fractures and a broken wrist. *Id.* Brewer also alleges that Valdez wrote a false disciplinary report against him. *Id.* Brewer seeks compensatory damages for pain and suffering and for an order protecting him from retaliation. *See id.*

The defendants attached to their summary judgment motion, (Docket Entry Nos. 23, 24, 25), several reports on the use of force, Brewer's medical records before and after the use of force, pictures of Brewer immediately after the use of force, and a video recording of the incident. Brewer filed a response to the motion, attaching several of the same records. *See* Docket Entry No. 26. The record is analyzed under the legal standards that apply.

## II.     The Legal Standards

### A. Summary Judgment

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A court considering a motion for summary judgment must consider all facts and evidence in the light most favorable to the nonmoving party." *Haverda v. Hays Cty.*, 723 F.3d 586, 591 (5th Cir. 2013). "However, to avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007). The nonmovant must "make a sufficient showing of an essential element of the case to which [he] has the burden of proof." *Id.* He "must set forth specific facts to establish that there is a genuine issue for trial, but where the evidential submissions lack probative value as to a genuine issue, summary judgment is appropriate." *Id.*

The substantive law determines what facts are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Capital Concepts Props. 85-1 v. Mut. First, Inc.*, 35 F.3d 170, 174 (5th Cir. 1994). "However, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to preclude summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998) (quoting *Anderson*, 477 U.S. at 252) (alteration in original). Rule 56, however, does not impose a duty on the district court to sift through the record in search of evidence to support the nonmoving party. *See Carr v. Air Line Pilots Ass'n Int'l*, 866 F.3d 597, 601 (5th Cir. 2017). The nonmovant must identify specific evidence in the record and articulate how the evidence supports the nonmovant's claim. *Id.* Conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

### B. Qualified Immunity

Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights. *See Mote v. Walthall*, 902 F.3d 500, 505 (5th Cir. 2018). "A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof," shifting it to the plaintiff to show that the defense is not available. *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019).

A plaintiff seeking to overcome qualified immunity must show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011). Courts of appeal are

free to decide which of the two prongs of the qualified immunity analysis to address first. *Id.*; *see also Camreta v. Greene*, 563 U.S. 692 (2011) ("[I]t remains true that following the two-step sequence—defining constitutional rights and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials."). The second prong is satisfied only if "the state of the law at the time of the incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (internal quotation marks omitted).

**III.    Discussion**

The defendants argue that they are entitled to qualified immunity because Brewer does not point to evidence supporting an inference that their actions were objectively unreasonable, considering the totality of the circumstances they faced. *See* Docket Entry No. 23. The defendants argue that Brewer has not pointed to record evidence that could impart an inference that they acted maliciously and sadistically, for the purpose of causing harm; instead, they argue that the evidence shows that, under the *Hudson* factors, the force they used did not cause more than de minimis harm and was limited to what was needed to control Brewer after he disobeyed orders to submit to restraints and took an aggressive stance against them. They argue that the evidence also shows that they took steps to minimize the amount of force they used. *Id.*

In his response, Brewer argues both that the use of force was obviously unconstitutional and that there are genuine factual disputes material to determining whether the force was unconstitutionally excessive. *See* Docket Entry No. 26. Brewer argues that the record shows that he suffered injuries that were more than de minimis and that the defendants' actions were not objectively reasonable. *Id.* He argues that the video does not show him resisting after he was

5

restrained, or any use of force. *Id.* Brewer argues that the officers disregarded his complaints of injury and pain immediately after the use of force, again, not captured on the video. *Id.*

### A. Qualified Immunity and Excessive Force

It was clearly established when the use of force occurred that a prisoner has the right to be free from having excessive force used against him. *See Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). To raise a factual dispute as to excessive force, a plaintiff must point to evidence showing: (1) an injury; (2) which resulted directly and only from a use of force that was clearly excessive; and (3) the excessiveness of which was clearly unreasonable. *Id.* at 628. The inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 398 (1989). The use of force must be evaluated "from the perspective of a reasonable officer. . . , rather than with the 20/20 vision of hindsight." *Poole*, 691 F.3d at 627 (quoting *Graham*, 490 U.S. at 397).

In evaluating the use of force in a prison, the "'core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically to cause harm.'" *See McCoy v. Alamu*, 950 F.3d 226, 230 (5th Cir. 2020) (citing *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). Courts examine: (1) the extent of the injury suffered; (2) the need for applying force against the prisoner; (3) the relationship between the need for force and the amount applied; (4) the threat that could be reasonably perceived by the prison officials; and (5) any efforts made to temper the severity of a forceful response. *See Hudson*, U.S. at 7. The use of force must be considered in context. The court's determination is based on the nature of the force more than on the extent of the injury. *See Bourne v. Gunnels*, 921 F.3d 484 (5th Cir. 2019).

### B. The Summary Judgment Record

The summary judgment evidence includes several reports, medical records before and after the incident, photos of Brewer after the use of force, and the video that shows the actions taken after Brewer was handcuffed.

#### 1. The Use of Force Reports

##### a. Officer Goodall's Report

Goodall's statement describes Brewer as provoking the use of force by disobeying officers' orders and acting aggressively in the hallway by North Gate 1. *See* Docket Entry No. 23-1 at 8, 16-17. According to Goodall, after Brewer took an aggressive stance against the officers, Gregory hit Brewer three to four times in the head and face. Ortiz, Geerdes, Valdez, and Goodall then used an unspecified amount of force to bring Brewer to the ground. Captain McMurrey arrived and helped secure Brewer. While the officers were trying to secure Brewer's right side, Brewer reportedly bit Valdez's hand and right leg. Geerdes applied the hand restraints and Villegas, who had joined the others, helped secure Brewer's legs. The video recording started at that point, when Brewer was already lying on the floor. Goodall narrated the video. The guards pulled Brewer to his feet and were escorting him toward the A-wing when, according to the guards and confirmed by the recording, he tried to pull away from Villegas and Clement. These officers forced Brewer back down to the ground, then back to his feet to continue escorting him toward the A-wing. Brewer was verbally abusive, but he did not try to pull away again.

Once in the A-wing, Brewer's restraints were removed. He was medically screened in the A-wing and photographed. The photographs and medical records show that Brewer had a superficial scratch, but he neither reported nor showed signs of other injuries. Goodall then read aloud and gave Brewer the UOF-2 Officer Participant Statement Goodall had written.

### b. Officer Clement's Report

Clement stated in his report that he had arrived in the hallway outside North Gate 1 to relieve Valdez, and was helping escort Brewer toward the A-wing when Brewer lunged at the officers. *See* Docket Entry No. 23-1 at 10-11. Clement and Villegas pushed Brewer to the ground. Brewer was then brought to A-wing without further incident, medically cleared, and Clement returned to his duties.

### c. Officer Geerdes's Report

Geerdes's report stated that he and Goodall gave Brewer several orders to allow them to place him in restraints. *See* Docket Entry No. 23-1 at 13-14. Brewer refused and instead took an aggressive stance and verbally threatened the officers. Gregory punched Brewer in the head, and Brewer returned the punches. Geerdes, Goodall, Valdez, Ortiz, Gregory, and McMurrey brought Brewer to the floor. Geerdes and McMurrey put Brewer's arms in restraints while Valdez applied the leg restraints. Villegas and Clement then lifted Brewer off the floor and began escorting him toward the A-wing. When they approached the Central Desk in the hallway by North Gate 1, Brewer lunged at the staff. Villegas and Clement took Brewer to the ground. When he was subdued, they continued towards the A-wing. Brewer was verbally abusive to the staff as they went through the hallway. At the A-wing, Brewer was medically cleared. There was no sign of any significant injury.

Geerdes saw Goodall read and give Brewer his offender participation statement. Geerdes then returned to his normal duties.

### d. Officer Gregory's Report

Gregory's report stated that he was assigned to the Central Desk when he responded to a report that Brewer was creating a disturbance in the hallway near North Hall Gate 1. *See* Docket

8

Entry No. 23-1 at 19-20. Gregory stated that he saw Brewer refuse orders to submit to restraints, take his glasses off, and assume an aggressive stance toward the officers. Gregory punched Brewer three to four times, and Brewer punched back. Valdez and Ortiz responded and helped Gregory apply downward pressure to bring Brewer to the ground. As Valdez relieved Gregory, he saw the other officers continue to escort Brewer towards the A-wing. Gregory went to the unit infirmary, but he was not injured in the scuffle.

### e. Captain McMurrey's Report

Captain McMurrey's report states that he was walking toward the Central Desk when he saw the struggle between officers and Brewer at North Gate 1. *See* Docket Entry No. 23-1 at 22-23. McMurrey saw officers trying to get a resisting Brewer on the floor. McMurrey came to help. He saw Brewer resist the officers' orders to submit to restraints. McMurrey helped Goodall, Ortiz, Valdez, and Geerdes bring Brewer to the ground. Brewer continued to resist as the officers tried to restrain his arms and legs. McMurrey helped secure Brewer's leg restraints.

McMurrey was relieved and returned to the Central Desk to help in the inmate count. As Brewer passed in front of the Central Desk with his officer escort, he kicked towards the officers and verbally abused them. McMurrey saw Villegas and Clement use downward pressure to place Brewer on the ground. Once Brewer calmed down, the officers continued escorting him to the A-wing.

### f. Officer Ortiz's Report

Ortiz's report states that he approached the North Gate 1, where he saw Brewer in a verbal confrontation with several guards. *See* Docket Entry No. 23-1 at 25-26. Brewer was given several orders to submit to restraints. Instead, he assumed a defensive posture, clenched his hands, and told the officers to come get him. Gregory approached and hit Brewer on both sides of the upper

9

body. Brewer fought back. Other guards tried to bring Brewer to the ground. Valdez succeeded in pulling Gregory out of Brewer's grasp. Brewer resisted being placed in restraints, and managed to get a set of keys from one of the guards. Brewer refused to release the keys when asked, and Ortiz managed to get them away from Brewer. After Brewer was restrained, the video camera that the guards had asked for arrived. Goodall narrated the recording. Ortiz walked away and returned to his normal duties.

### g. Officer Valdez's Report

Valdez's report states that he and Ortiz were walking from the chapel when they saw Brewer in the North Gate 1 hallway. Brewer was being verbally abusive to the staff. *See* Docket Entry No. 23-1 at 29-30. Valdez saw that Goodall was the supervisor on the scene, accompanied by McMurrey, Geerdes, and Gregory. Goodall gave Brewer orders to submit to restraints. Brewer instead backed away, clenched his fists, and said, "get the camera cus y'all gonna have to whoop me." Goodall asked for the video camera, but before it came, Brewer made an aggressive movement towards the officers. Gregory hit Brewer in the upper body, and Brewer returned the blows.

Goodall, Geerdes, and Ortiz came to Gregory's aid by trying to place Brewer on the ground. Valdez pulled Gregory away from Brewer to prevent him from landing more blows, while other officers tried to secure Brewer with restraints. When Valdez was helping apply the restraints, Brewer bit his left hand and tried to bite his right leg. Valdez returned to his normal duties after Brewer was restrained.

### h. Officer Villegas's Report

Villegas's report states that he responded to a use of force in progress. Villegas helped apply the leg restraints to Brewer. *See* Docket Entry No. 23-1 at 32-33. After Brewer was

10

restrained, Villegas helped escort Brewer toward the A-wing. Brewer began to pull towards, and verbally assault, Gregory when he was being escorted through the hallways past the Central Desk. Villegas and Clements brought Brewer to the ground. After Brewer calmed down, they pulled him back to his feet. Brewer was brought to A-wing. Villegas removed the restraints and went back to his normal duties.

### i. Officer Graham's Report

Graham's report states that he was the officer sent to fetch the video camera to record the use of force incident. *See* Docket Entry No. 23-1 at 35. He recorded while Goodall narrated. The recording continued as Brewer was escorted to the A-wing. The recording showed Brewer pull away from Villegas and Clement. The officers took him to the ground and then pulled him back on his feet after he was removed and became calm. Once in the A-wing, Brewer's restraints were removed, and he received a medical examination. Goodall then read Brewer the offender participation statement.

### 2. Medical Records

The Estelle Unit clinic records for June 17, 2018, show that Brewer came to the clinic with an injured finger from playing basketball. *See* Docket Entry No. 24 at 108. Brewer was instructed to rest his hand and told that he would be scheduled for an X-ray. *Id.* at 112. On June 27, Brewer missed a scheduled clinic appointment. *See id.* at 81. On August 14, Brewer was again seen at the Estelle Unit clinic about his finger. *See id.* at 62. An X-ray was ordered at the UTMB hospital. *Id.* at 65. On August 17, Brewer was seen at UTMB for a possible hand fracture. *See id.* at 8-16. X-rays and tests showed a fracture in the fifth metacarpal with sclerosis and callus formation along the fracture line that were consistent with healing. *Id.* at 8.

On September 17, Brewer missed a clinic appointment that had been scheduled to follow up on his hand. *See id.* at 79. The use-of-force incident occurred the following day, September 18. LVN Sessions checked Brewer for injuries. *See* Docket Entry No. 23-1 at 62-64; Docket Entry No. 24 at 105. Medical records show that Sessions found no sign of injury. Sessions noted that Brewer told her that his hands "tingled," but he denied an injury from the use of force.

On September 25, Estelle Unit clinic records show that Brewer reported wrist and rib pain. Docket Entry No. 24 at 101. Brewer was able to bend forward, backwards, squat, twist his abdomen, and rotate his wrist. *Id.* Brewer was given Tylenol for pain management and told to revisit the clinic for further evaluation. *Id.* at 102.

On October 1, Brewer was seen at the Estelle Unit clinic after he complained of pain and swelling in the wrist and ribs. *See id.* at 72. The exam notes state that Brewer's ribs looked symmetrical and that he was able to hold deep breaths for three seconds. *Id.* Brewer had full range of motion and strength in his wrist, but he did have moderate swelling. *Id.* The treating physician ordered an X-ray and Tylenol for pain management. *Id.*

On October 9, 2018, Brewer was seen at UTMB after he continued to complain of right wrist swelling and rib pain. *See* Docket Entry No. 23-1 at 14-15; Docket Entry No. 24 at 24. The exam noted that X-rays of the left and right ribs showed no pneumothorax, but they did show callus formation on the right lateral seventh through ninth rib fractures. Docket Entry No. 24 at 24. Brewer's hand also showed subacute healing of a proximal metacarpal fracture with a superimposed chronic distal fifth metacarpal fracture but no wrist deformation or fracture. *Id.* A November 6, 2018, follow-up exam at UTMB showed a remote healed fifth metacarpal bone with deformity but no acute boney abnormalities. *See id.* at 44.

On February 1, 2019, Brewer missed clinic appointments that had been scheduled because he was still complaining of wrist and hand pain. *See id.* at 77, 78. On February 20, 2019, Brewer was again seen for hand pain. An X-ray showed a healed fifth metacarpal fracture. *See id.* at 66-68.

### 3. The Video Recording and Post-Incident Photographs

The use-of-force video recording does not show the initial use of force. *See* Docket Entry No. 25. The recording begins after Brewer was on the ground and in hand and leg restraints. The recording then shows the officers helping Brewer stand back up with Officers Villegas and Clements escorting him towards the A-wing. When Brewer was next to the Central Desk, the video shows him move towards the desk. The escorting officers promptly take him to the ground. Once he is calm, the officers again help Brewer get to his feet and continue escorting him toward the A-wing. Brewer is heard threatening those escorting him.

When the group arrived at the A-wing, the officers put Brewer in a holding area and removed his restraints. Brewer was seen by L.V.N. Sessions and he was photographed. Goodall then read Brewer an incident report.

The photos of Brewer after the incident show a cut or abrasion on his right ring finger. The photos also show indentation marks on Brewer's wrists, without any broken skin, where he was handcuffed. *See* Docket Entry No. 23-1 at 74, 75. The photographs do not show swelling in the wrist or hand, back, or rib areas. *See id.* at 72-75. No other injuries are shown. *Id.*

### C. The Motions Filed by Valdez, Ortiz, and Goodall

Brewer alleges that Valdez struck him several times and wrote a report falsely alleging that Brewer bit Valdez. Docket Entry No. 1 at 4. Brewer alleges that Ortiz restricted his breathing by sitting on his back. *Id.* Brewer alleges that Goodall participated in the use of force against him,

13

but Brewer does not describe Goodall's actions. *Id.*

### 1. Valdez

Brewer's allegations against Valdez are conclusory, vague, and unsupported by the record evidence. The descriptions of Valdez's actions come primarily from the complaint and the response to the motion for summary judgment, but they do not describe Valdez's actions in detail. In the complaint, Brewer alleges that Valdez "struck me several times in excessive use of force, wrote false report which resulted in fractured bones and sent to high security." *See* Docket Entry No. 1 at 3. In the response to the motion for summary judgment, Brewer states that "Valdez joined in and wrote me a false report which had me sent to high security for a year[.]" *See* Docket No. 26 at 2.

The record does not support these allegations. First, the record reflects that Valdez reported his bite injury in the post-altercation medical examination and his use of force report. Other officers involved in the use of force recall Brewer biting Valdez. These officers reported that Valdez did not use force against Brewer but instead pulled Gregory off Brewer while other officers tried to apply leg and wrist restraints. Second, even assuming that Valdez did punch Brewer, the record shows that these punches were in response to Brewer's refusal to submit to restraints. Third, the record shows that the use of force occurred when the officers were trying to place restraints on a resisting Brewer. Finally, the record shows that Valdez took steps to temper the amount of force the officers used. For example, Valdez pulled Gregory off Brewer. The video shows that Valdez did not use force after Brewer was in restraints. Brewer's claims against Valdez cannot survive the qualified immunity defense because the record shows that, as a matter of law, the force Valdez used was objectively reasonable in the circumstances.

### 2. Ortiz

Brewer alleges that Ortiz briefly sat on his back while restraining him, restricting his breathing, until Brewer was secured in restraints. The record shows that Ortiz's actions were within the limits of qualified immunity. The amount of force he used was limited in time and degree, and it ended as soon as Brewer was restrained. The undisputed facts in the record show that the force Ortiz used was consistent with securing a resisted prisoner; the need for the use of force was apparent; the amount of force used was limited; and Ortiz did not use force after Brewer was secure. The claims against Ortiz are denied.

### 3. Goodall

Similarly, Brewer's allegations and the record do not support the conclusion that Goodall violated Brewer's rights. The record shows that Goodall grabbed Brewer's legs while he was resisting efforts to restrain him. Goodall helped secure Brewer's legs until the video camera arrived. The record also shows that Goodall narrated the use of force video recording, and did not participate in any use of force while the camera was recording. Goodall cannot be liable for the actions of other officers on this record, and the actions he personally took were objectively reasonable. The claim against Goodall is denied.

### D. Geerdes

Brewer alleges that Geerdes put his hands around his handcuffs as if they were brass knuckles and told Brewer that the makeshift brass knuckles were for him. Docket Entry No. 1 at 3-4. Brewer alleges that Geerdes hit Brewer with the make-shift brass knuckles after Gregory hit Brewer. *Id.*

Similar to the other defendants, Brewer's allegations against Geerdes are conclusory and not supported by the evidence in the record. For example, no part of the use-of-force reports

15

discuss Geerdes hitting Brewer or using handcuffs as brass-knuckles. Instead, the record shows that Geerdes took an active role in taking Brewer to the ground but that he did not use additional force after restricting Brewer's arms. Brewer's body photos do not show scratches, scrapes, redness, or bruising that would be consistent with the use of makeshift brass knuckles. Considering the *Hudson* factors, the record does not support or reference that Geerdes used force maliciously to inflict pain. Geerdes's use of force against Brewer was to help bring him to the ground and put him in restraints after he resisted commands to allow the officers to apply the restraints. Once Brewer was in restraints, Geerdes did not apply force.

Brewer had broken ribs from the overall use of force. This is consistent with being taken forcibly to the ground, which the record shows was objectively reasonable because Brewer was in an aggressive stance, verbally abusive, and refused orders to allow officers to put him in restraints. The record does not support an inference that Brewer was injured from any use of the makeshift brass knuckles he alleges Geerdes threatened. The broken ribs did not require medical treatment beyond the pain pills Brewer received, and they did not cause lasting injury or prolonged pain. Brewer did not have marks, lesions, or bruising that would suggest an unreasonably forceful application of handcuffs. The lack of marks or injuries linked to Geerdes's use of force indicates that the amount of force used was reasonable in relation to the need. The claim against Geerdes is denied.

### E. Gregory

Brewer alleges that Gregory punched him two to six times in the face. Docket Entry No. 1 at 3-4. The record supports the allegations that Gregory punched Brewer in the face or upper body area. Multiple use of force reports cite Gregory as punching Brewer in the face or upper body area after Brewer refused commands to submit to restraints. But, the record shows that this

use of force ended when other officers brought Brewer to the ground and Valdez pulled Gregory back. The record does not support an inference that Gregory continued to use force after the need to restore order when Brewer refused to submit to restraints.

Gregory did not apply force against Brewer after Brewer was restrained, which indicates an effort to minimalize the severity of the force. Brewer's broken ribs are clearly from the overall use of force. Brewer complained only of pain and slight difficulty breathing. Brewer did not have marks, lesions, or bruising on his face or upper body as a result of Gregory's use of force. The lack of marks or injuries directly linked to Gregory's use of force indicates that the amount of force used was not objectively unreasonable in relation to the need. The use of force was in reaction to Brewer's refusal to submit to restraints and after he had taken an aggressive stance against Geerdes, Goodall, and Gregory. The claim against Gregory is denied.

### F. Villegas

Brewer alleges that, while he was handcuffed and shackled, Villegas slammed him into the ground. Docket Entry No. 1 at 4. The video and record show that Brewer was put on the ground while in handcuffs as he was escorted past the Central Desk and lunged toward the officers. The record does not support an inference that this use of force was objectively unreasonable or that it was done maliciously or sadistically.

The use-of-force reports state that Brewer moved towards Gregory before being taken down. These reports also state that no further force was used against Brewer once he was on the ground. The video is consistent; it shows that after Brewer lunged towards the Central Desk, the guards escorting him took him to the ground. The video does not show additional force. While Brewer does maintain that he "sa[i]d what [he] sa[i]d to [] Gregory [when] [he] was already past him[,]" that does not negate or contradict the actions shown on the video. *See* Docket Entry No.

17

1-1 at 3. Brewer's conclusory statements that the force used was excessive do not raise factual disputes material to determining that the force used was objectively reasonable, given Brewer's active resistance to being escorted to the A-wing, his actions towards the guards before he was escorted, and his lunging towards the officers escorting him – including an officer involved in the earlier altercation. The claims against Gregory are dismissed.

### IV.     Conclusion

The claims against the defendants are dismissed because they are entitled to qualified immunity. Defendants' motion for summary judgment, (Docket Entry No. 23), is **GRANTED**. Final judgment is entered by separate order.

SIGNED on September 25, 2020, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge